# NO. 12-22-00101-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF K.D.,* | § | *APPEAL FROM THE 321ST* |
| *A CHILD* | § | *JUDICIAL DISTRICT COURT* |
| | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

B.D. appeals the termination of his parental rights. He presents eight issues on appeal. We affirm.

### BACKGROUND

B.D. is the father of K.D. C.C. is the mother of K.D.[1]  On December 20, 2019, the Department of Family and Protective Services (the Department) filed an original petition for protection of K.D., for conservatorship, and for termination of B.D.'s and C.C.'s parental rights. The Department was appointed temporary managing conservator of K.D.

At the conclusion of a trial on the merits, the trial court found, by clear and convincing evidence, that B.D. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), (N) and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between K.D. and B.D. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between K.D. and B.D. be terminated. This appeal followed.

---

[1] C.C. is not a party to this appeal.

In his first four issues, B.D. challenges the admission into evidence of the investigator's affidavit of removal, challenges the admission of statements made by another child, and contends the admission of this evidence constitutes harmful, cumulative error.

## Standard of Review and Applicable Law

We review a trial court's admission of evidence under the abuse-of-discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

We will not reverse a trial court's judgment based on the erroneous admission of evidence unless we conclude that the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). In determining whether the erroneous admission of evidence was harmful, we review the entire record. *Interstate Northborough*, 66 S.W.3d at 220. "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Id.* The erroneous admission of evidence that is cumulative of other properly admitted evidence is harmless. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Hearsay is an out-of-court statement that a party offers into evidence to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d). Generally, hearsay is not admissible unless provided for by the Texas Rules of Evidence, a statute, or other rule. TEX. R. EVID. 802. Hearsay within hearsay is not admissible unless each part of the combined statements conforms with an exception to the general rule excluding hearsay. *Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *see* TEX. R. EVID. 805; *Knox v. Taylor*, 992 S.W.2d 40, 64 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

## Analysis

B.D. urges that the trial court abused its discretion when it admitted the investigator's removal affidavit into evidence. He contends the affidavit contained statements made by a child other than K.D., which were hearsay within hearsay. He further urges that the trial court abused its discretion when it allowed testimony regarding those same statements into evidence. The

Department urges that, even if it were error to admit the statements, any error was harmless because the evidence is cumulative.

Sarah Hassel, a Department investigator, testified at trial. During her testimony, the Department offered Hassel's removal affidavit into evidence. B.D. objected, urging that the affidavit was hearsay and contained statements from another child, A.D., which were hearsay within hearsay. The trial court found that the affidavit satisfied the public records exception to the hearsay rule and overruled B.D.'s objection. Hassel also testified, subject to a running objection from B.D., to A.D.'s statements made during her forensic interview.[2] Hassel testified that A.D. stated that B.D. "began touching her when she was approximately ten years old." A.D. also reportedly stated that B.D. "put his hand in her pants and touched her vagina . . . laid down on her and took off her pants and underwear where he attempted to put his penis in her vagina," and "at one point sperm came out from his penis and he cleaned it up with a towel." A.D. further stated that the same abuse happened to K.D.

Tyler Police Department records were also admitted into evidence, and B.D. does not complain about their admittance on appeal. Those records contained a report from "Investigator M. Brock" noting that she obtained a warrant on August 4, 2020, for B.D. for "Continuous Sexual Abuse of a Young Child, a 1st Degree Felony." The records also contain a dispatch narrative from December 18, 2019, reporting that "a father had been sexually abusing his two daughters," and that he "reportedly impregnated the older one and forced her to have the pregnancy aborted some time last year." The records also include Brock's reports from her investigation of the aggravated sexual assault allegation. In those reports, Brock described setting up a forensic interview for both K.D. and A.D. At the time of the forensic interview, A.D. was sixteen years old and told the interviewer that she lived with B.D., who was a father figure to her but not her biological father. The report also details that A.D. told the forensic interviewer about the occasions B.D. would touch her private parts with his fingers or his penis. A.D. also told the interviewer that K.D. was being abused. The records include notes from a second forensic interview in which A.D. details that B.D. had sex with her repeatedly and got her pregnant.

Furthermore, Hassel testified, without objection, that A.D. underwent a sexual abuse exam that verified she had been abused. Hassel also testified, without objection, that she

---

[2] The running objection was limited to A.D.'s statements during the interview.

believed K.D. and A.D. were forced to keep their abuse secret for years and that they eventually made credible outcries of sexual abuse by B.D.

Assuming without deciding that A.D.'s statements contained in the removal affidavit and Hassel's testimony were improperly admitted, B.D. must demonstrate harm. Because the same evidence was also admitted via the Tyler Police Department records and other testimony, any error in the admission of the removal affidavit and hearsay testimony is harmless. *See Nissan Motor Co.*, 145 S.W.3d at 144; *Interest of C.U.D.*, No. 14-21-00427-CV, 2022 WL 711104, at *9 (Tex. App.—Houston [14th Dist.] Mar. 10, 2022, pet. denied) (mem. op.). We overrule B.D.'s first, second, third, and fourth issues.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.).

Section 161.001 of the Family Code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2022); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.—Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations

4

sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## Standard of Review

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.—Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

## Termination Under Section 161.001(b)(1)(d) and (e)

In his fifth and sixth issues, B.D. argues the evidence is legally and factually insufficient to terminate his parental rights pursuant to subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).

### Applicable Law

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (D) addresses the child's

surroundings and environment. ***In re N.R.***, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. ***In re S.R.***, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. ***Ybarra v. Tex. Dep't of Human Servs.***, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. ***In re R.D.***, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). It is not necessary that the parent know for certain that the child is in an endangering environment; rather, awareness of the potential for danger and a disregard of the risk is enough to show endangering conduct. ***Interest of J.H.***, No. 09-20-00056-CV, 2020 WL 4516860, at *10 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.); *see* ***Interest of E.S.***, No. 12-20-00282-CV, 2021 WL 2483788, at *3 (Tex. App.—Tyler June 17, 2021, no pet.) (mem. op.). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. ***In re N.K.***, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); ***In re M.D.S.***, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. ***Tex. Dep't of Human Servs. v. Boyd***, 727 S.W.2d 531, 533 (Tex. 1987); ***In re D.M.***, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. ***Boyd***, 727 S.W.2d at 533; ***In re J.J.***, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. ***In re N.R.***, 101 S.W.3d at 776; ***Ybarra***, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. ***Ybarra***, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. ***In re N.R.***, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. ***Interest of T.A.***, No. 12-20-00276-CV, 2021 WL 2182316 at *4 (Tex. App.—Tyler May 28,

6

2021, pet. denied) (mem. op.). We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id.*

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well-being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

<u>Analysis</u>

On appeal, B.D. urges the evidence is insufficient to support termination under both subsections (D) and (E). Specifically, he urges that the physical evidence did not demonstrate that he is the one who committed the sexual abuse against K.D. B.D. also contends K.D.'s

outcry statements are insufficient on their own to prove that he perpetrated the abuse. He further urges that the evidence did not show that he knowingly allowed K.D. to remain in surroundings that permitted sexual abuse by someone else.

Misty Permenter, a sexual assault nurse examiner (SANE) nurse, testified that she performed a SANE exam on K.D. in December 2019. K.D. was seven years old at the time of the exam. During the exam, K.D. told Permenter:

> My stomach be hurting because at school I had to throw up two times. I went home. First thing in morning I woke up, my feet are wobbly, and I be tall. I told my sister my belly got smaller. I live with my sister, brother, and daddy. My daddy touched me on my privates under my night clothes. It happens almost every day. He touches me with his hands and his boy parts on my butt. He comes to my room to do it at night. My brother [ ] does it, too, in the front room on the floor by the couch. I think I was five when it started. Daddy puts his mouth on my privates and my butt.

According to Permenter, abdominal pain is frequently associated with sexual assault. Permenter also conducted a physical examination during which she discovered K.D.'s "belly was tender to palpitation" and K.D.'s hymen was swollen and "bright red." Permenter emphasized that "the entire opening of her vaginal cavity was swollen and red." Permenter opined that K.D.'s examination was consistent with sexual assault.

Investigator Hassel testified that she first spoke with K.D. at her school. During that initial conversation, K.D. described both physical and sexual abuse. According to Hassel,

> [K.D.] described how there would be times that she would get in trouble, and she would get whipped on her bottom with a belt. She said that it left marks and bruises and that those lasted a long time and made her tooth wiggly.
>
> . . .
>
> [K.D.] identified her private parts and said that she uses them to go to the restroom. I asked if anybody has ever tried to touch those parts of her body, and she said yes. I asked who. She said her daddy. And I asked where. She said at her home. And from there, I concluded the interview.

K.D. also told Hassel that she had been instructed "not to talk about anything." Hassel then set up a forensic interview. K.D. denied sexual abuse at the forensic interview the following day; however, she made a subsequent outcry to the SANE nurse. Her SANE exam corroborated her outcry and was consistent with sexual abuse. Hassel stated that she recommended removing K.D. from B.D.'s home based on these facts.

Hassel further testified that this was not the Department's first intake regarding B.D. The first alleged report of sexual abuse occurred in August 2015. However, that was disposed of as "unable to determine" because K.D.'s older sibling recanted her outcry at the request of her mother. As part of her investigation, Hassel reviewed the impact records from the 2015 case. And as a result, she was concerned B.D. "was continuously abusing the children in his home, and had been coaching them and using scare tactics with other individuals in the children's lives to help conceal the sexual abuse." She also believed he attempted to evade the Department and potential criminal proceedings "for a number of years." Hassel further believed K.D. and A.D. were both forced to keep their sexual abuse secret for years and that both children ultimately made credible outcries of sexual abuse by B.D. She testified that the SANE exam performed on A.D. verified A.D.'s outcry of sexual abuse.

Tyler Police Department records regarding B.D. were also admitted into evidence. Those records contain numerous reports of domestic disturbances and police responses involving B.D. Alleged victims included B.D.'s girlfriend and son. Again, the records included Brock's report stating that she obtained a warrant on August 4, 2020, for B.D. for "Continuous Sexual Abuse of a Young Child, a 1st Degree Felony." The dispatch narrative from December 18, 2019 reported that "a father had been sexually abusing his two daughters," and that he "reportedly impregnated the older one and forced her to have the pregnancy aborted some time last year." Brock's reports from her investigation of the aggravated sexual assault allegation demonstrate that A.D. told the forensic interviewer about the occasions on which B.D. touched her private parts with his fingers or his penis. A.D. also told the interviewer that K.D. was being abused by B.D. and that K.D. was "bleeding down there" in her vaginal area because of "daddy." She stated that K.D. was "whooped" by B.D. for telling A.D. about the abuse. A.D. further recounted an incident when she thought B.D. was touching K.D. because she saw his hand "around her private area" when they were watching television in bed. The records contained the SANE report, in which A.D. told the SANE examiner that B.D. touched her private area. She stated, "When it first started I was like in middle school, and he started putting his private area in my private area."

The records also include notes from a second forensic interview following the children's removal from B.D.'s care in which A.D. details that B.D. had sex with her repeatedly and got her pregnant. A.D. told the interviewer that B.D. would have sex with her and she allowed it so that

"he wouldn't do it to [K.D.]" She reported that B.D. had been having sex with her from the age of nine or ten until she was sixteen. According to A.D., B.D. had intercourse with her every two days. At one point, she discovered she was pregnant when she went to the bathroom and "the baby was hanging from her 'thing'" and "there was a cord and a baby hanging from me." A.D. reported that she was throwing up and losing blood, so B.D. took her to the hospital. A.D. lied to the social worker at the hospital and did not disclose that B.D. was the father.

Investigator Brock's notes include conversations with several people acknowledging that they knew of B.D.'s abuse but did not take action against it. This included B.D.'s friends and family members.

Merissa Ryser, a Department caseworker, testified that K.D. made outcries to her on at least three separate occasions. Ryser visited K.D. monthly. And on a minimum of three occasions, K.D. said she wanted to talk about what "her dad had done to her. And she said it wasn't appropriate . . . it was bad, and she was understanding that what he had done was wrong."

CASA volunteer Amy Russo testified that K.D. told her "my daddy did nasty things to me." Russo testified, "I don't think she's lying about the sexual abuse," and "I don't believe she should ever be forced to have to see, meet, or be in the same room with him ever again."

The trial court had ample evidence from which it could find, by clear and convincing evidence, that B.D. sexually abused K.D. and sexually abused other children, including A.D. After reviewing the evidence in the light most favorable to the judgment, we hold that a reasonable factfinder could have formed a firm belief or conviction that B.D. knowingly placed or knowingly allowed K.D. to remain in conditions or surroundings that endangered her physical or emotional well-being and that he engaged in conduct or knowingly placed K.D. with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *Interest of T.R.L.*, No. 10-14-00290-CV, 2015 WL 1020865, at *6 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) (inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his or her home represents a part of the "conditions or surroundings" of the child's home); *see also In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634. Therefore, we hold the evidence is legally and factually sufficient to support termination of B.D.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule B.D.'s fifth and sixth issues as to subsections (D)

and (E) of Texas Family Code Section 161.001(b) and need not address his seventh and eighth issues regarding termination under subsections (N) and (O).[3] *See* TEX. R. APP. P. 47.1.

**DISPOSITION**

Having overruled B.D.'s first, second, third, fourth, fifth, and sixth issues, we ***affirm*** the trial court's judgment.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered July 29, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[3] B.D. does not challenge the trial court's best interest finding.

11

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 29, 2022**

**NO. 12-22-00101-CV**

**IN THE INTEREST OF K.D., A CHILD**

Appeal from the 321st District Court
of Smith County, Texas (Tr.Ct.No. 19-3102-D)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*